Good morning, your honors. I'm Jeffrey Baird. May it please the court, I'm representing the claimant in this Social Security Disability case. Mr. Mitchell has a constellation of very severe impairments, a lung impairment called sarcoidosis, cardiomyopathy, renal insufficiency, hypertension, and he has a lot of medications he takes for them. The treating physician, Dr. Park, in January 2010 issued a medical source statement. There were two treating physicians, right? There was Dr. Pollock and Dr. Park? True. There's Dr. Pollock and Dr. Park. And they said somewhat contradictory things in January 2010. They do, and I can resolve that contradiction. Okay. Dr. Park evaluated the medications, listed the medications, which were greater than they had been in the past, and identified fatigue as a medicative side effect, as well as risk of infection due to the immunosuppression. Also Dr. Park looked at all of the impairments together, if you notice. He discusses sarcoidosis, cardiomyopathy, everything. By contrast, Dr. Pollock said cardiomyopathy imposing sedentary work, and the physician's assistant said morbid obesity imposing sedentary work. So Dr. Park actually identified more impairments. He discussed the medications. The medications were heavier than they'd been in the past, and he summed up more of the impairments as a constellation. Now, counsel, the state law judge cited the report that your client was stable with respect to the sarcoidosis being progressive? By character, it's a progressive disease, but the lung scans, the lung scans showed stability over the year 2009. From our standpoint, when we look at this from the question of whether there's substantive evidence in the record as a whole to support the ALJ's decision, can he not rely on the doctor's conclusion that it had stabilized and is no longer progressive? Not that it's no longer progressive as character, but he could say that it's stable. But the treating physician treated it more heavily with more medications. That's Dr. Park. So it's unclear what that stability in the lung scans means. I thought part of the problem here was noncompliance with the treatment protocols. I mean, there are references to that throughout the notes of the doctor. It wasn't noncompliance with the sarcoidosis. It was hypertension, I think, that caused the dramatic events. But the hypertension was brought in at a level of control when he followed his medications. And stayed on a diet, right? That was the other part of the problem. That was part of it. But remember, even Dr. Arnold said he's Pickwickian. That's a great Dickensian term. He's Pickwickian. He's got his obesity, but it's interlocked with this lack of activity of any kind. He says he has to lie down a lot each day, and that would be consistent with the morbid obesity. But my question was with regard to whether or not he was doing what his doctors told him to do. And part of that is regularly taking his hypertension medication and watching his diet. And apparently that was a problem for him. Those were problems. Well, I don't see any issue about taking his medication. It seemed to me in the last several years that he was taking his medication. And in fact, his blood pressure had gotten much better. Well, yes, the blood pressure improved to a control point. But on the obesity, I mean, we have case law on that. It's obviously an extremely difficult problem. It's a different kind of noncompliance in the sense that there's no immediate feedback. It's exceedingly difficult. There are many people. And I thought the agency's rule was essentially, we're not going to hold somebody noncompliant without losing weight. Well, particularly with morbid obesity, he's over 350 pounds at times. So it's not just a matter of self-control. It's part of this Pickwickian syndrome with his... It's a good word. I'm not sure what it means. Mr. Pickwick had the problem. Mr. Pickwick was also very overweight. Yes, that's right. So the plaintiff did testify that he had drowsiness from medications and that he had to lie down throughout the day. And that was corroborated by Dr. Park's opinion in January of 2010. And then the ALJ... Let me ask a global question. The last insured date was like 2007. Is that right? Right. He's also SSI. So therefore, because he's also SSI, the... What does that mean? In other words, the ALJ's big problem seemed to be, he was... In credibility, he said he was looking at his 2007 or 8 form and comparing it to his conditions in 2010 and saying he wasn't credible. But the question is, is his condition in 2010 what's controlling or partially controlling or what? In 2010, according to Dr. Park, things are generally worse. Okay. So therefore, what? Therefore, he's eligible for benefits for part of the period or what? Right. Part of the period and moving forward. I should tell the court in good faith, he is paid right now. He's being paid under Social Security SSI now, but it's based on later evidence. As of what? As of three weeks after the ALJ's decision, but based on later evidence. So what's at stake in this particular proceeding? This is a sentence for remand I'm asking for. Yeah, but what are you asking for? So what... Since he was paid as of three weeks after the ALJ opinion? I just found that out, yes. All right. And since it's possible, even probable I'd say, that if we were to reverse, it wouldn't cover... he was unlikely to get benefits all the way back, but for some sub-period perhaps. So we're talking about a relatively short period. Well, at least 12 months, maybe more. Sorry, what? At least 12 months, maybe more. Also, Dr. Park's 2010... I'm just wondering about mootness. Is there any suggestion of mootness here? If the benefits have already been paid? They haven't been paid back, though. They haven't been paid back to the period at issue here. So that's what's at stake in this proceeding? In this proceeding, that's true. So we're arguing over about a year's worth of benefits. Is that what's at stake? Well, as it turns out, yes, Your Honor. I think that's probably realistic. Okay. I'm sorry, I didn't hear that last. Yes, about a year's worth of benefits is what we're talking about here. I take these cases late in the game, and I often don't know exactly what's happened prior. Not that that's an excuse. We appreciate your candor. I mean, it's helpful sometimes for us to know what the subsequent history has been. Thank you, Your Honor. I also wanted to discuss the issue of... I assume that that is not a tentative decision. That's a firm commitment by the... That's a firm commitment by the agency. That's written in stone now. Right. Okay, I wanted to discuss the peculiar question of stooping. Here's how the argument works. The ALJ has the burden of production at step five. The ALJ can meet that by calling a VE and identifying a significant number of jobs. Under two rulings, SSR 8314 and 96-9P, a complete preclusion on stooping usually results in a disability finding, because most unskilled sedentary jobs require at least occasional stooping. That seems very weird to me. I don't know any jobs that entail stooping. They have statisticians who work this out. The puzzle it leaves is, most of the jobs that the VE identified washed out because they were too skilled. But 1,300 remained in Washington, 41,000 nationwide. Ordinarily, those are significant numbers. They're low, but they would be considered significant. So this is the semiconductor bonding, which is essentially bench work, is it not? You sit at a bench and you solder parts to a circuit board. That's it. I don't see where stooping is in the debt directory, a dictionary of occupational titles. It's in the two rulings. Stooping is listed on what they call... You can get it on Westlaw. It's under DICOT. They'll do a number of postural limitations, including stooping. So is the issue then that we have to decide whether, if there are 1,300 semiconductor bonding jobs available regionally, is that a sufficient number of available jobs? Is that what the case comes down to? Correct, because the ALJ did not make that fact finding. The ALJ found hundreds of thousands of jobs to be significant, and tens of thousands... Well, he found three different jobs, one of which was the semiconductor bonding, for which there are 1,300 jobs regionally and several thousand nationally. Right. Okay, and so if we knock out the other two, I forget what they were, assembly line something or other, then we still have a finding by the ALJ that he's capable, even with a stooping restriction, of doing the bench work of a bonder. Well, but is it significant in numbers? That's the question. Is 1,300 significant or not? Well, maybe not under the rulings. I'm not quite understanding the argument. Is the argument that this semiconductor bonding job must have stooping because all those jobs have stooping? No, it doesn't have stooping. So then what's the argument? That there's not a significant number of jobs shown... That 1,300 isn't enough? How do we know? The ALJ didn't make that fact finding. What does the stooping have to do with it? I don't understand it. It knocked out all the other jobs. Well, we know that they were already knocked out because they were knocked out because they were over-skilled anyway. Well, right. But I'm out of time. It's a curious argument. I made too much of it, perhaps, in my brief. But the two rulings give a special status to stooping. That calls into question whether the remaining jobs, the 1,300, would be significant. It should have had additional V.E. testimony. But our case law basically would say, yes, 1,300 would be enough unless there's some specific disability by this particular claimant so that only a fraction of those 1,300 jobs would be available. Isn't that what our case law suggests? No, it's whether or not the 1,300 is representative of a wider world of work. It's never an exhaustive number. But the case I'm thinking of, the Judge Pregerson opinion, I can't remember the title of it.  Beltran. because of other limitations on our ability to get to all those regional jobs. We don't have that here, do we? Not the inability to get to them. Let me see if I can repeat your argument. It's that the 1,300 jobs are not supposed to be the universe. They're supposed to be representative of some universe. And that the universe, because of the stooping problem, is smaller than it would otherwise be. Right. But the 1,300 do not require stooping, correct? That's right. Okay. All right. Thank you, Counsel. And 1,000 nationally, too. Very well.  Thank you. We'll hear from the Commissioner. Good morning, Your Honors. I'm Daphne Binet, appearing for the Commissioner of Social Security in this case. Ms. Binet, would you bring us up to date on the revelation that benefits have already been awarded in this case? And help us figure out what's left to be decided here. I was not aware of that until Mr. Baird brought that up today. The Commissioner doesn't know that the benefits have been paid? No. I mean, that wasn't an issue in this case. And it's a closed record. So we confine ourselves to what's before the court. And the subsequent award of benefits isn't part of this judicial procedure. But it's the same application, is it not, that resulted in the award of benefits several weeks after the decision? Well, according to Mr. Baird, if I understand Mr. Baird's representations, that's the case. But in terms of... It's an application or a different application. I assume it's a different application. You don't know. Because you don't know anything about it. Okay. Don't you have to make another application after... This one is closed because benefits were denied. And then for some later period of time, he can apply again under the rules, right? That's correct. And even Ozenbrock says... But the award was made shortly after the decision to close this one. I'm really quite confused. Well, it's a different period of time, though. Isn't that the distinction? It would be a later period of time? That's correct, Judge Tallman. And I don't think that it affects... If you look at defendant's brief on page 15, footnote 2, the commissioner explains the period at issue here, which was from the alleged disability onset date of August 25, 2006, through the date of ALJ's March 2, 2000 decision, at least on the state of this record. Okay. So to go to this case, then. What... The credibility determination seems particularly suspect here to me. And I can ask some questions about why. But the question is, what was it used for by the ALJ? What difference does it make a difference here? In other words, he... I mean, what happened here, as I understand it, is that this was in 2010, and he found him not credible as to his accounts for what he could do in the house, for example, based on a 2007 checklist. You know, which doesn't do a lot for me, because it seems to me that obviously things can change between 2007 and 2010. So what does it prove? Well, the ALJ is looking at not only the period 2007 and 2010, Judge Berzon, but he's also looking at the allegations starting from the alleged disability onset of 2006. Well, I understand. But in terms of saying, well, he's not telling the truth because he said in 2007 that he prepared the food, and now he's saying his kids prepared the food. Well, I mean, I don't know what's contradictory about that. I mean, he could have prepared the food in 2007. His kids could be preparing it now. What does that prove? Nothing. Well, with all due respect, Your Honor, I think what the ALJ is getting at is there's an allegation of disabling limitations, symptoms and limitations from the alleged onset date. And if you examine the entire record, there's this inconsistency in, you know, that he's saying at one period that he could perform these activities, and in another period he's saying he can't. And so? And so he's not telling the truth? Well, I think the judge can reach that conclusion under this case. How? If things don't change in three years? Well, I would respectfully submit, Your Honor, that PARA in the Tonopetchan case allows the ALJ. I'm sorry, I can't hear you. I would respectfully submit that PARA in the Tonopetchan case allows the ALJ to look at inconsistencies and determine if they're material. And that he didn't even note that he was looking at three years apart time periods. But the ALJ looks at the entire time period, Your Honor. But he did. I'm being specific now. I mean, he set us to specific things. You know, he said that, and now he's saying this, and that's contradictory. And it just isn't. Right, within the context of the entire time frame in this case where Mr. Mitchell's All right, so if I thought his credibility determination didn't stand up, how would that affect the overall outcome? That's really what I want to ask you. I don't think it affects the outcome for two reasons, with all due respect. I think Well, I didn't have any, you don't have to have due respect because I'm asking you a question. I'm not stating anything. I don't think it affects it because the ALJ relied on daily activities. The ALJ relied on inconsistencies. The ALJ relied on numerous other factors in this case. I think court case law is clear that even where ADLs or even the broader context of, there's a differing interpretation of the evidence that the court doesn't retry factual conclusions. I thought the ALJ also cited to his explanation that insurance issues precluded him from the medical noncompliance. But the ALJ said that the record noted that the insurance issues had been resolved, but the medical noncompliance problems remained as another basis for the inconsistencies in his testimony. Right, and I also want to point out, that's correct, in terms of this discussion about obesity, the ALJ did not reject Dr. Park's opinion on the basis of noncompliance with obesity. I'm having trouble hearing you. The ALJ did not reject Dr. Park's opinion based on failure to lose weight or obesity issues. Similarly, when he got to the claimant's objectives complaint, he didn't reject them for failure to lose weight. What he rejected them was on the basis of noncompliance with diet. Where's the noncompliance discussion in the ALJ opinion? What was the noncompliance? Oh, I see. In addition, there's been evidence that he's not been entirely compliant. Well, he did say with a special diet, so he was talking about his obesity. And what's the example of noncompliance with the medication? I don't even know where that is. That's on page 6. I know he said it, but what is it? I'd have to.  and he was trying to lose weight. He was taking it except for a couple of day-long lapses because of non-insurance coverage. He was taking it. So what's he talking about? He's talking about page 640, Your Honor. And if you would like, I could get the record of some of it. Uh-huh. Well, from what I could tell, he was taking reams of medication and he was taking what he was told to take except for a couple days when he couldn't get it for insurance reasons. The ALJ also cites other pages, too, at page 20. Exhibits 404, 611. And I'm sure that I cited to those specific pages in my brief. Counsel, is there an issue of waiver here? Has the petitioner or the applicant preserved these issues on appeal? Were they raised in the opening brief? I'm glad you asked that, Your Honor. I don't believe that Mr. Mitchell has because Mr. Mitchell attempts to excuse his raising multiple arguments on appeal in his reply brief at page 4 by saying that the purpose is to explain district court briefing more deeply and the presumable purpose of appellate litigation is not to simply recite lower court briefing. Mr. Mitchell doesn't cite to any authority for this presumption. In fact, Commissioner submits that this theory is contrary to Ninth Circuit case law in Dream Palace v. County of Maricopa, 384 F. 3rd, 990 at 1005. The court said, quote, Ordinarily, we decline to consider arguments raised for the first time on appeal. This rule serves to ensure the legal arguments are considered with the benefit of a fully developed factual record, offers appellate courts the benefit of a district court's prior analysis, and prevents parties from sandbagging their opponents with new arguments on appeal. And what are the arguments that were not raised? I identified them in my brief in multiple places, but also even, for example, in the reply brief, there are new arguments based on brews about establishing a disability standard and benchmarked by beating testimony, which brews does not hold at all. In fact, that's not even a cognizable legal argument in that case. It doesn't stand for that proposition. Mr. Mitchell contends that the Commissioner did not suffer prejudice in this case. With all due respect, I submit that the government did. The government had to spend more time than it would have ordinarily done. It could have been used in other Social Security cases. Here we have not only one opening brief, but based on the reinventing of this case, we had to submit another opening brief in this court addressing all the waiver arguments. We not only had one reply brief by Mr. Mitchell in district court, but then we have a reply brief submitting yet more arguments. And then, you know, on a basis of all of this peaceful litigation, you know, this could have been resolved by the district court, or litigation could have been terminated earlier. Even with respect to 8314 argument, the first time on appeal Mr. Mitchell now raises particular provisions of his argument with 8314 in his reply brief. He didn't do that in district court. He didn't do that in his opening brief before this court. And I submit that that is just not the purpose of the appellate process. In Wally, 368 F. 3rd, 1165 and 1163, 9th Circuit, 2004, the court said- Counsel, are these cases referred to in one of the briefs? No, they're not, Your Honor. It's only after I- This is in response to- Did you file a 20HA letter? No, I didn't. This is in response to- All right. Before you leave the courtroom, please get a form from the deputy clerk which sets out the cases you want us to look at and serve your opponent, please. Yes, Your Honors. And they specifically said federal courts are not run like a casino game in which players may enter and exit on pure whim. And so I respectfully request that this court allow the- disallow based on waiver the multiple attempts at reinventing this case based on new arguments. Very well, Counsel. I'm going to- I must be missing something because Justice Scanlon is aware of it, but I'm looking through the brief and I didn't pick it up the first time. I'm still not picking it up now, what the waiver issues are, exactly what you say was waived. Okay. You can go through that in my opening brief. Well, I'm looking at your opening brief and I'm obviously not reading very well, but I'm not finding it. Okay. Okay, on page 30, we discussed the 83-14 argument. All right, so there's a footnote. Yeah, there's a footnote. This is the stooping argument. Is that basically what we're talking about here? That's the one that I can find right now. That's it. That's all there is.  There's numerous times and everything else, but we're talking about a footnote. Well, I'm talking about not only that, but the reply brief about 83-14. I'm talking about the Bruce case. I would like to address if that's okay. Counsel, your time has expired. Thank you very much. The case just argued will be submitted for decision.
judges: O'scannlain, Berzon, Tallman